UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:

340 BISCAYNE OWNER LLC

Debtor.

_____/

Case No. 21-17203

Chapter 11

### DECLARATION OF CRISTIANE BOMENY IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I hereby declare that the following is true based upon my personal knowledge of the business records of Debtor 340 Biscayne Owner LLC.

## I. INTRODUCTION

1. My name is Cristiane Bomeny. I am over the age of 18 and am competent to testify. I am the Manager of 340 Biscayne Owner LLC ("Debtor").

2. I do not have any equity interest in the Debtor and receive no compensation from the Debtor. I was named Manager to assist with the Chapter 11 on July 26, 2021.

3. To minimize any adverse effects on the Debtor's businesses as a result of the commencement of this Chapter 11 case, the Debtor intends to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief and are designed to, among other things: (a) continue the Debtor's operations while in Chapter 11 with as little disruption as possible; (b) allow the Debtor to continue serving valued customers and operate its business pending a restructuring of Debtor's debt; and (c) establish procedures for the smooth and efficient administration of this case. The relief requested in the First Day Motions will be crucial to the success of the Debtor's efforts to facilitate an orderly reorganization to be effectuated through the contemplated restructuring of the Debtor's debts.

4. I submit this declaration (the "Declaration") in support of the Debtor's Chapter

11 voluntary petition and the First Day Motions. As the Manager of Debtor, I have personal knowledge of the Debtor's books and records, and the Debtor's financial and operational affairs. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees or advisors. In making the statements herein based upon my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, I have relied upon these employees to accurately record, prepare and collect any such documentation and other information.

5. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or my personal opinion, except as otherwise noted. I am authorized to submit this Declaration on behalf of the Debtor.

## II.    PRELIMINARY STATEMENT

**A.    The Chapter 11 Filing**

6. On July 26, 2021 (the "Petition Date"), the Debtor filed its voluntary petition in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

7. As of the date hereof, no creditors' committee has been appointed in this case. In addition, no trustee or examiner has been appointed.

8. The Debtor is operating its business and managing its affairs as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

B.  **Overview of the Debtor's Corporate Structure**

9.  Debtor is a limited liability company organized under the laws of the State of Delaware.

10.  BH Downtown Miami LLC is a limited liability company organized under the laws of the state of Delaware ("Parent") and owns 100% of the outstanding membership interests in Debtor.

C.  **Description of Debtor's Business, Historical Financial Performance, Financial and Management Structure, and Reasons for Filing Chapter 11**

  i.  **Property Ownership**

11.  Debtor's sole assets are the hotel located at 340 Biscayne Boulevard in Miami, Florida, commonly known as Holiday Inn Port of Miami-Downtown, (the "Hotel"), which Debtor has owned and operated since 2015, an interest in a ground lease, and an option to purchase the land on which the Hotel is located (the "Option").

12.  While Debtor owns the improvements located at 340 Biscayne Boulevard, to wit, the building that houses the Hotel (the "Hotel Building"), and the Hotel operations, the parcel of land upon which the Hotel Building is situated (the "Land") is owned by Kawa 340 Biscayne LLC ("Kawa 340"). Debtor leases the Land from Kawa 340 pursuant to that certain ground lease dated July 15, 2016, as amended (the "Ground Lease"), but the Debtor holds the Option to purchase the Land from Kawa 340.

13.  Debtor is current on its obligations under the Ground Lease.

  ii.  **Hotel Franchise Flag**

14.  The Hotel operates under the Holiday Inn flag, an IHG Hotels & Resorts Brand, pursuant to that certain License Agreement dated May 31, 2016 (the "License Agreement") entered

into by and between Debtor and Holiday Hospitality Franchising, LLC (the "Licensor"), as amended.

15.     Pursuant to the License Agreement, Debtor pays the Licensor a monthly fee which includes, *inter alia*, a royalty on gross rooms revenue.

16.     Debtor is current on its obligations under the License Agreement.

### iii.     Hotel Finances and Management

17.     Debtor contracts with Aimbridge Hospitality Holdings, LLC ("Aimbridge" or the "Operator") to handle day-to-day operations of the Hotel, pursuant to that certain Hotel Management Agreement dated May 18, 2016 (the "Management Agreement").

18.     Debtor maintains three separate bank accounts for the Hotel operations. The Collection Account (the "Collection Account") receives all incoming payments, including all merchant payments, whether made online or in-person at the Hotel, and all payments from online booking services. The only transfers made from the Collection Account are transfers to the Operating Account (defined below) and limited direct payments to third parties to pay obligations of Debtor related to the Hotel, such as insurance, real property taxes, ground lease rent, legal fees and costs and recertification costs. While the Operator has the ability to view the Collection Account and reconcile the transactions, only Debtor has the ability to disburse funds from the Collection Account.

19.     All other obligations of the Debtor are paid from the Operating Account. Pursuant to the Management Agreement, Debtor is obligated to provide working capital to Operator for the Hotel, including, but not limited to, funds sufficient to operate, maintain, and equip the Hotel, including payroll. Upon request from the Operator, substantiated by an accounts payable aging report, Debtor will transfer funds from the Collections Account to the Operating

Account (the "Operating Account") from which Operator will pay those expenses which have come due, so the Operator can make payments in a timely manner.

20. A third account housed the remaining funds from the disbursement of Debtor's Second Draw PPP Loan (the "PPP Funds Account"). The funds from the Second Draw PPP Loan have been depleted, but the account remains open while Debtor pursues forgiveness.

21. Pursuant to the Management Agreement, all Hotel Employees ("Hotel Employees") are employees of the Operator, and all compensation of the Hotel Employees is an Operating Expense, borne by Debtor, and paid in advance to Operator upon demand.

22. Debtor is current on all of its obligations under the Management Agreement, the Hotel is fully insured, and taxes are current.

### iv. Hotel Operations

23. The Hotel offers 200 rooms and over 2,000 square feet of meeting space, as well as onsite dining. Prior to the COVID-19 pandemic and the subsequent closures required by local government, the Hotel was regularly at 90%+ occupancy and enjoyed annual operating revenue in excess of $10,000,000.00. The Hotel's proximity to the Port of Miami, American Airlines Arena, and Downtown Miami makes it an attractive destination for business and leisure travelers. The Hotel has historically performed strongly in comparison to its STR[1] Report Competitive Set, primarily driven by this strategic location, and by carrying the long-established Holiday Inn name.

24. Beginning in March 2020, however, the Hotel operations were very limited due to emergency orders issued by local government in response to the COVID-19 pandemic. This limited operation, which lasted over two months, seriously affected the Debtor's operations, revenues, and workforce. Although the Debtor took proactive measures to reduce expenses

---

[1] STR provides premium data benchmarking, analytics and marketplace insights for global hospitality sectors and is well-known, and heavily relied upon, by hotels around the world.

wherever possible, including reducing the number of full-time employees and the fixed operating costs associated with the Debtor's business, COVID-19 restrictions made it challenging for the Debtor to maintain profitability and satisfy other key financial health metrics that its lenders require it to maintain.

25.     In the interest of stabilizing the Hotel operations until restrictions related to COVID-19 were lifted, the Debtor obtained a loan of approximately $700,000 under the Paycheck Protection Program ("PPP"), which it used for payroll and other expenses allowed under the PPP (the "First Draw PPP Loan").  In 2021, the First Draw PPP Loan was forgiven under the terms of the PPP.  In 2021, the Debtor obtained a second loan under the PPP in the amount of $989,219 which it used for payroll and other expenses allowed under the PPP (the "Second Draw PPP Loan").  The Debtor is currently in the process of seeking, and expects to receive, forgiveness of the Second Draw PPP Loan under the terms of the PPP.

26.     Although the Hotel was allowed to remain open, the cruise industry remained in a state of stasis, pursuant to the CDC No Sail Order which was extended until October 31, 2020 and then, on October 30, 2020, supplanted by the CDC Framework for Conditional Sailing Order (collectively, the "CDC Sailing Restrictions").  The CDC Sailing Restrictions are expected to remain in effect until as late as November 1, 2021.  On July 3, 2021, Royal Caribbean's Celebrity Edge became the first cruise ship to leave a U.S. port since the beginning of the COVID-19 pandemic, and limited cruise departures have begun at the Port of Miami as well.

27.     While the Hotel does not cater exclusively to the cruise industry, the Hotel does derive a great benefit from the pre- and post-cruise bookings.  Prior to the COVID-19 pandemic, the Hotel estimates cruise passengers comprised 70% of its Thursday, Friday, Saturday and Sunday bookings.  In fact, in 2019, more than a third of the Hotel's reservations originated from contractual

agreements related to the cruise industry.

28. During the pandemic, the Debtor did everything it could to generate income, welcoming airline crew and essential workers. However, the resultant reduction in room rates and room sales has made it difficult for the Debtor to maintain the level of profitability that it has historically enjoyed and that it needs to continue operating its business.

29. The Debtor has made great strides in the last sixteen months since implementation of government orders during the COVID-19 pandemic. Since January 2021, occupancy rates have returned to an average of 80%, and the Hotel's performance from January through March 2021 exceeded industry forecasts, which has allowed Debtor to remain current on virtually all of its obligations.

30. The Debtor expects the return of the cruise passenger business to further benefit its bottom line. Earlier this year, Carnival Cruise Lines announced that its first quarter 2022 bookings are pacing ahead of the same time frame from 2019, and the market anticipates existing pent-up demand will drive a strong and rapid rebound for the cruise industry and those businesses, like Debtor, that are buttressed by the cruise industry. The Debtor has performed well this year, but its lender will not cooperate with the Debtor to refinance or extend the debt, thereby causing the Chapter 11 filing.

      **v.**    **340 Biscayne Loan**

31. On or about July 1, 2017, Debtor and FirstBank Puerto Rico dba FirstBank Florida ("Prior Lender") entered into a Loan Agreement dated as of July 15, 2016 between Debtor and Prior Lender, as amended (as amended and assigned, the "340 Biscayne Loan Agreement"). Pursuant to the Loan Agreement, Debtor delivered to Prior Lender a Promissory Note evidencing the Loan (the "340 Biscayne Loan") in the original principal amount of $18,240,790.03, which

Note was later assigned to 340 Biscayne Lendco, LLC ("Lender") effective as of October 3, 2019 (the "340 Biscayne Note"). Lender is the current owner and holder of the 340 Biscayne Loan and the 340 Biscayne Loan Documents (as defined below).

32. The 340 Biscayne Loan and the 340 Biscayne Note are secured by, *among other things*, a: (i) Leasehold Mortgage, Assignment of Leases and Rents, Fixture Filing and Security Agreement which was assigned to Lender (collectively, as modified and assigned, the "First Leasehold Mortgage"); (ii) Assignment of Leases and Rents, as modified and assigned to Lender (collectively, as modified and assigned, the "First ALR"); and (iii) certain UCC Financing Statements.

33. On or about October 3, 2019 the Debtor executed an Omnibus Modification of Loan Documents, which served to modify the terms of the 340 Biscayne Loan Documents (the "340 Biscayne Omnibus Modification", together with the 340 Biscayne Note, the First Leasehold Mortgage, the First ALR, the 340 Biscayne UCCs, the Pledge, the Bomeny 340 Biscayne Guaranty, and all other documents evidencing or securing the 340 Biscayne Loan, as amended, modified, and assigned are collectively referred to herein as the "340 Biscayne Loan Documents"), and consolidated the 340 Biscayne Loan with the Aguamarine Loan, as defined and described below.

   **vi. Aguamarine Loan**

34. On or about April 10, 2018, Aguamarine Services Corp. ("Aguamarine"), an affiliate of the Debtor, executed and delivered to OTM Lendco, LLC ("Prior Aguamarine Lender") a promissory note in the principal amount of $20 Million (the "Aguamarine Note") and a Loan Agreement, which were later assigned to Lender. The Aguamarine Note is secured by, *among other things*, a Second Leasehold Mortgage, Assignment of Leases and Rents, Fixture Filing and

8

Security Agreement, which encumbers the Debtor's Ground Lease interest (altogether, the "Aguamarine Loan Documents").

35. As part of the Omnibus Modification in 2019, Lender caused the Debtor to become responsible for the debt of its affiliate Aguamarine. Since Lender had acquired the 340 Biscayne Loan and already owned the Ground Lease on the Property, it tightened its hold on the Property and the Debtor through the Omnibus Modification. The Omnibus Modification provided, among other things, the following: (a) the Aguamarine Loan and 340 Loan were cross-defaulted, such that a default on one caused a default on the other, (b) the Debtor became a guarantor of the Aguamarine Loan, and (c) the Debtor granted a second priority security interest in all of its assets to secure the guaranty obligation. In essence, the Debtor became liable as a guarantor for the Aguamarine debt, and pledged its property to secure that obligation.

36. On September 30, 2020, both the Aguamarine Note and the 340 Biscayne Note matured. Due to the pandemic and decreased operations, Debtor and Aguamarine were unable to pay, and lenders were not willing to refinance a hotel in the middle of the COVID-19 pandemic.

37. Prior to the maturity date the Debtor sought an extension of the Loan, but the Lender refused. In addition, the Debtor sought relief from Kawa 340 (Lender's affiliate) on the Ground Lease rent, which Kawa 340 refused. While other lenders and landlords were helping their borrowers and tenants in the tourism industry affected by COVID-19, Debtor's Lender and affiliated landlord would not. Instead, at the twelfth hour, Lender agreed to merely forbear from exercising its rights against the Debtor and Aguamarine under the terms of an onerous forbearance agreement, which also provided for payment of the Ground Lease rent. In light of the worldwide crisis occurring in the Fall 2020 and the impact on hotels, the Debtor had no choice but to sign it or lose a valuable asset with all of its equity in the property.

38. Consequently, Lender and the Debtor executed a Forbearance and Settlement Agreement (the "Forbearance Agreement"), dated November __, 2020, by, between, and amongst Debtor, Lender, Guarantor, BH Downtown and Aguamarine, which provided, *inter alia*, that Lender would not take enforcement action or institute any proceedings with respect to the 340 Biscayne Loan Documents or Aguamarine Loan Documents until April 15, 2021 (the "Termination Date"). In exchange, the Debtor was required, among other things, to acknowledge the debt obligation, consent to foreclosure and deposit into escrow a deed in lieu of foreclosure and other transfer documents. The Forbearance Agreement further provided that in the event Debtor delivered a Loan Commitment (as defined in the Forbearance Agreement) to Lender on or before the Termination Date, the forbearance period would be extended from April 15, 2021 for ninety (90) calendar days until July 15, 2021.

39. Prior to the Termination Date, Debtor delivered to Lender a Loan Commitment which would pay Lender in full. Pursuant to the Forbearance Agreement, the forbearance period was extended to July 15, 2021 (the "Extension Date").

40. Unfortunately, the Debtor was unable to close the refinancing by July 15, 2021 and requested additional time. Lender refused to even discuss it, despite the restrictions presented by Covid 19, the incredible performance the Hotel has exhibited since the restrictions were lifted, and the fact that the Debtor managed to keep the Ground Lease rent current throughout the pandemic.

41. The total amount of debt due Lender under both Loans is approximately $37 million, which includes: (a) approximately $20 million under the 340 Loan; and (b) approximately $17 million under the Aguamarine Loan.

42. I am not aware of any other creditor with a lien on the Hotel or the cash collateral.

**vi.    Lender's Equity Cushion and Events Leading to Bankruptcy**

43.    There is no question that Lender is oversecured and adequately protected. The appraised value of the Debtor's interest in the Hotel, Ground Lease and option to purchase the Land is over $100 Million. In addition, the Lender has recourse against Aguamarine for the Aguamarine Loan, and a guaranty from Gilberto Bomeny for all of the debt. The taxes and expenses of the Hotel are current, the management is stable, the property is insured, and the Debtor has advised the Lender repeatedly of its refinancing efforts. Therefore, the Lender will not be adversely affected by the use of its cash collateral or the time it takes to file a plan of reorganization.

44.    Prior to the Petition Date, Lender advised Debtor that it will not grant any further extensions of the forbearance and would immediately take action to enforce its remedies under the 340 Biscayne Loan Documents, the Aguamarine Loan Documents, and the Forbearance Agreement. Without a Chapter 11 filing, the Lender would obtain the transfer documents from the escrow agent and transfer all of the Debtor's assets to Lender.

45.    The Lender told me that they filed a complaint in foreclosure, but the Debtor has not been served with any complaint and I have not seen any pleadings or other documents related to the filing he claimed to have made.

46.    As a result, Debtor has been left with no option but to file this Chapter 11 petition in order to preserve the going concern value of Debtor's assets and operations, restructure debt as necessary to the operations of the Debtor's business, negotiate a plan of reorganization, and work with all of its existing creditors to address the impact of the temporary revenue reduction arising from state and city regulations mandating the closure of the Hotel.

47.    It is not surprising that Lender consistently refused to give the Debtor any

extensions. Notably, Lender and Kawa 340, the ground lessor, are related entities – sibling subsidiaries of Kawa Capital Management, Inc. ("Kawa").  Kawa is not a traditional lender, but rather a real estate investor. The appraised value of the assets securing the debt significantly exceeds the outstanding debt secured thereby, and by foreclosing on the debt, Kawa gains control of both the Land and the improvements upon the Land, which is ripe for development– a real windfall to the Lender.

48. Additionally, the Option to purchase the land from Kawa 340 is an extremely valuable asset of the Debtor.  In the event that Lender forecloses on the Loans, the Debtor would lose that Option, which is a huge loss for the Debtor and a huge benefit for Lender's affiliate Kawa 340.

49. The Debtor has successfully operated a profitable enterprise for many years and is well known in the industry.  The Debtor projects that it will rehabilitate its operations over the next few months as consumer and business tourism return to more normal levels.  Since the lifting of the restrictions and increase in tourism, lenders and investors are more eager to loan money or invest in this type of property, so the Debtor's financing opportunities have increased dramatically in the past two months.

50. Because the value of Debtor's enterprise far exceeds the value of Lender's liens, the foreclosure of the property would eliminate the Debtor's equity in the property and benefit the Lender and its affiliate Kawa 340.

### III.     FIRST DAY MOTIONS AND NECESSITY FOR EMERGENCY HEARING

51. As Manager of Debtor, I am generally familiar with the contents of each of the First Day Motions (including the exhibits thereto) described in further detail herein. Based upon that general familiarity and the information provided to me by other members of the Debtor

management team and my colleagues who report to me or provide information to me in the ordinary course of the Debtor's business, I believe that the relief sought in each of the First Day Motions is necessary to: (a) prevent additional loss of valuable employees; (b) enable the Debtor to operate in Chapter 11 with minimal disruption or loss of productivity and value; (c) allow the Debtor to continue serving valued customers and operating the business pending a restructuring of its debt; and (d) prevent immediate and irreparable harm to the Debtor's businesses as a whole. Concurrently herewith, the Debtor has filed or will be filing the following First Day Motions for which the Debtor requests that the Court conduct a hearing as soon as possible after the commencement of the Debtor's bankruptcy case (the "First Day Hearing"):

i. Debtor's Emergency Application for Approval of Employment of Linda Worton Jackson and the Law Firm of Pardo Jackson Gainsburg, PL as General Bankruptcy Counsel for the Debtor-In-Possession Effective as of the Petition Date;

ii. Debtor's Emergency Motion for Entry of an Order Authorizing the Debtor to Use Cash Collateral and Provide Adequate Protection;

iii. Debtor's Emergency Motion for Entry of an Order: (I) Authorizing the Payment of Priority Pre-Petition Wages, Salaries, Earned Bonuses, and Employee Benefits; and (II) Authorizing the Debtor to Continue the Maintenance of Employee Practices and Benefit Plans and Programs in the Ordinary Course of Business; and,

iv. Debtor's Emergency Motion for an Order Under Sections 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code Authorizing (i) Maintenance of Existing Bank Accounts; (ii) Continuance of Existing Cash Management System, Bank Accounts, Checks and Related Forms; (iii) Limited Waiver of Section 345(B) Deposit and Investment Requirements; and (iv) Granting Related Relief

52. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical and necessary to the Debtor's ability to maximize the value of its assets for its creditors and shareholders, maintain its day-to-day operations, and generally maintain and preserve the going concern, enterprise value of the

business.

**A.    Debtor's Emergency Application for Approval, of Employment of Linda Worton Jackson and the Law Firm of Pardo Jackson Gainsburg, PL as General Bankruptcy Counsel for the Debtor-In-Possession Effective as of the Petition Date**

53.     The Debtor seeks authority to retain, Linda Worton Jackson, Esq. ("Ms. Jackson") and the law firm of Pardo Jackson Gainsburg, PL ("PJG") as general bankruptcy counsel effective as of the Petition Date.  The Debtor understands that Ms. Jackson and PJG have extensive experience representing Chapter 11 debtors in this district and that they are well-qualified to serve as general bankruptcy counsel to the Debtor.  The Debtor believes it is in the Debtor's best interests, and those of its creditors, that Ms. Jackson and PJG be retained to serve as Debtor's general bankruptcy counsel in its Chapter 11 case.

54.     To the best of the Debtor's knowledge, except as disclosed in the Declaration of Linda Worton Jackson, on behalf of Pardo Jackson Gainsburg, PL, as proposed counsel for the Debtor, neither Ms. Jackson nor PJG has any connection with the Debtor's creditors or other parties in interest or their respective attorneys.

55.     I am aware that corporations may not appear in a Florida or Federal court within Florida pro se, and that only a licensed attorney may appear on their behalf.  Because there is a myriad of relief that must be sought from the Court immediately, the Debtor will suffer immediate and irreparable harm if it is unable to obtain the services of counsel.  For example, the Debtor requires the Court's approval of an agreement for the use of cash collateral.  Without the use of cash, the Debtor will be unable to operate its business and maximize the value of its assets for the benefit of its estate.  It is, therefore, my belief that only with the granting of approval of counsel's employment will such immediate and irreparable injury be avoided.  In that regard, counsel advises that this relief has been granted in other Chapter 11 cases in this District.  Accordingly, in the

exercise of my business judgment, it is in the best interests of the Debtor, its estate and creditors to retain PJG as its counsel.

**B.     Debtor's Emergency Motion for Entry of an Order Authorizing the Debtor to Use Cash Collateral and Provide Adequate Protection**

56.     The Debtor seeks authorization to use cash collateral pursuant to a cash collateral budget prepared by the Debtor for the period from July 2021 through October 2021.

57.     In connection with the Debtor's proposed use of cash collateral and in order to provide the Lender with adequate protection for the aggregate diminution of the cash collateral resulting from the Debtor's use thereof, the Debtor has agreed, subject to approval of this Court, that the Lender, shall have, *nunc pro tunc* as of the commencement of this Chapter 11 case, replacement liens pursuant to section 361(2) of the Bankruptcy Code on and in all property of the Debtor acquired or generated after the Petition Date, but solely to the same extent and priority, and of the same kind and nature, as the property of the Debtor securing the prepetition obligations to the Lender under the Pre-Petition Loan Documents.

58.     The Debtor proposes to use the cash collateral for U.S. Trustee's Fees, Attorney's Fees, and hotel operations in accordance with the terms of the Budget prepared by the Debtor. The Debtor also requests that it be authorized: (i) to exceed any line item on the Budget by an amount equal to ten percent (10%) of each such line item; or (ii) to exceed any line item by more than ten percent (10%) so long as the total of all amounts in excess of all line items for the Budget do not exceed ten percent (10%) in the aggregate of the total Budget.

59.     Supplemental to the replacement liens provided to the Lender, the Debtor will furnish to the Lender monthly reporting on the collections and disbursements from the Hotel.

60.     An immediate and critical need exists for the Debtor to be permitted access to cash collateral in order to continue to operate its business and preserve its ongoing, enterprise

value. If the Debtor is not allowed to use cash collateral, its business operations will be substantially interrupted. This would result in a significant diminution in the value of the Debtor's assets (including the cash collateral) to the detriment of the Debtor's creditors and interest holders and other harm to the Debtor's estate. The proposed use of cash collateral, therefore, is essential to sustain the Debtor during this Chapter 11 case and to prevent irreparable harm to the Debtor's estate. The Budget provides adequate funds to pay anticipated administrative expenses during the pendency of this Chapter 11 case.

61. The proposed use of cash collateral is necessary, essential and appropriate for the continued operation of the Debtor's business, and the preservation of the assets of the estate. Given the circumstances of this case and of the Debtor, the terms of the use of cash collateral are fair, reasonable and adequate, and in the best interest of the Debtor's estate. The use of cash collateral provides the Debtor with working capital pursuant to the Budget, pending approval of the use of cash collateral on a permanent basis at the Final Hearing. I submit that granting of the relief sought is necessary and appropriate and in the best interests of the Debtor, its creditors, its shareholders and its customers.

**C.     Debtor's Emergency Motion for Entry of an Order: (I) Authorizing the Payment of Priority Pre-Petition Wages, Salaries, Earned Bonuses, and Employee Benefits; and (II) Authorizing the Debtor to Continue the Maintenance of Employee Practices and Benefit Plans and Programs in the Ordinary Course of Business**

62. The Debtor is requesting the entry of an order authorizing it to (a) pay various pre-petition wages, salaries, earned bonuses and employee benefits of the Debtor's employees, and (b) continue the Debtor's various pre-petition Employee practices, benefit plans and programs provided by the Debtor in the ordinary course of its business.

63. As of the Petition Date, the Debtor, through Operator, employed approximately thirty-five (35) full and part time employees, including management, cleaning, repair/maintenance,

waitstaff, and operations/administrative staff ("Employees").  The Debtor, through Operator, pays its employees every other week.  The most recently closed payroll cycle began on Sunday, July 4, 2021 and closed on Saturday, July 17, 2021.  Debtor's payroll provider withdrew monies from the Operating Account for that payroll cycle on Wednesday, July 21, 2021 and Employees received their paychecks or direct deposit, as applicable, on Friday, July 23, 2021.  The payroll for the employees to be distributed on August 6, 2021 is for the pay period ending July 31, 2021, which will include 8 days of pre-petition employee obligations, from July 18, 2021, through and including July 25, 2021. The total amount of gross wages due to be paid to Operator for the pre-petition payroll is approximately $53,000.00.

64. As part of the foregoing relief, the Debtor also seeks authorization to pay all federal and state withholding and payroll-related taxes relating to pre-petition periods including, but not limited to, all withholding taxes, Social Security taxes, and Medicare taxes, as well as all other withholdings such as life insurance and other employee deductions, if any.

65. The Operator has established various employee benefit plans and policies for the benefit of Debtor's employees which include health insurance, vacation pay, personal time off and other similar benefits (collectively, the "Employee Benefits").  Debtor is obligated to pay these Employee Benefits pursuant to the Management Agreement.  The Debtor seeks authority to honor these obligations in the ordinary course of business.

66. All regular, full-time hourly Employees are eligible to accrue paid sick and personal days.  The Debtor seeks authority to honor in the ordinary course of business all liabilities to its Employees that arose under its vacation and personal day policies prior to the Petition Date. The Debtor anticipates that its Employees may utilize any accrued vacation time or personal days in the ordinary course of business without resulting in any material cash flow requirements beyond

the Debtor's normal payroll obligations.

67. The Debtor has sufficient funds designated to pay the payroll costs of its employees.

68. I believe that the relief requested in the Pre-Petition Wages Motion will enable the Debtor to maintain its current operations without interruption, thereby preserving the value of the business, and, at the same time, maintain employee morale. Without the relief requested, the Debtor's ability to preserve the Debtor's going concern value and maximize the value of its assets for all creditors of its estate will be adversely affected, particularly if the Debtor is unable to retain its dedicated and loyal Employees.

**D.** **Debtor's Emergency Motion for an Order Under Sections 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code Authorizing (i) Maintenance of Existing Bank Accounts; (ii) Continuance of Existing Cash Management System, Bank Accounts, Checks and Related Forms; (iii) Limited Waiver of Section 345(B) Deposit and Investment Requirements; and (iv) Granting Related Relief**

69. The Debtor's Cash Management System facilitates the timely and efficient collection, management and disbursement of funds used in the Debtor's business.

70. If the Bank Accounts were closed, Debtor would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures for payments into and out of the Debtor's accounts, which would disrupt the flow of post-petition receipts and disbursements. In addition, closing the Bank Accounts would require Debtor to cancel and reinstitute wire transfer instructions, which would be difficult to modify under exigent circumstances. This disruption would severely impact and could irreparably harm the Debtor's ability to operate at this critical juncture. Opening a new bank account would require the Debtor and its Manager to obtain approval from the Operator, each of the credit card companies, travel sites and other payors, all of which require certain restrictions be placed on the account. This

process could take several weeks, and in the meantime, the Debtor would not receive the funds from the payors until the process were complete.

71. I believe that the relief requested in the Cash Management Motion will enable the Debtor to maintain current operations without interruption, and preserve its relationships with critical vendors and customers, thereby preserving the value of the business.

### IV.    DEBTOR'S OBJECTIVES IN THIS CASE

72. The primary purposes of the filing of this Chapter 11 Case is to, *among other things*: (a) continue the Debtor's operations while in Chapter 11 with as little disruption as possible; (b) allow the Debtor to continue serving its valued customers and operate its business pending a restructuring of its debt, (c) establish procedures for the smooth and efficient administration of this case, and (d) refinance its Loans. Through the motions described above and other motions and applications the Debtor may file later, the Debtor hopes to minimize any adverse effects that this Chapter 11 case might otherwise have on its business, employees, and its customers.

73. The Debtor anticipates filing a Plan of Reorganization within 120 days from the Petition Date that will provide for, *among other things*, payment in full of the Loans through an outside lender refinancing, and payment in full of the priority, administrative and general unsecured claims, with continued ownership and operation of the Hotel by the Debtor.

74. For all of these reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

**28 U.S.C. § 1746 Declaration**

    I declare under penalty of perjury that the foregoing is true and correct. Executed on this 26th day of July, 2021.

_____
Cristiane Bomeny
Manager of 340 Biscayne Owner LLC